Green, J«
delivered the opinion of the court.
The first question to be considered is, as to the true construction of this agreement. The obvious meaning of this covenant is, that a deed was to be made for the land, and possession given on the one hand, and the payment of the purchase money, secured by ihe execution of the notes, on the other, at one and the same time, and that lime as fixed in the covenant was the 1st of January, 1833. Although the first day of January is not repealed in the stipulations, as to the execution of the deed and the notes, yet that was plainly the meaning of the parlies, and is the obvious sense of the words they have used. But if this were less clear, from the words that are used in these stipulations than it is, still, by taking the covenant all together, all doubt would be removed. Christmas stipulated in the covenant for Smith’s notes, with Lemuel Smith as security. He not only provides that he shall be secured in the payment of his money, but he names the individual who must join in the execution of the notes. That he should be so particular as to covenant for security, and to designate the person to be given as sue!), and yet have agreed to give up the possession of his land, and rely on Smith subsequently to give the notes and security, is preposterous. In that event, ii Smith should fail to give the notes and security, what would have been the remedy for Christmas? He could not have compelled him to do it, but he must have been content with his action on the covenant, or the enforcement of his lien upon the land, or the recision of of the contract. Neither of these remedies would have answered the purposes for which the sale was made. They would have been tedious, expensive and troublesome. It would not, therefore, have been in the mind of either of the parties, that Christmas was to part with the possession of his land, without having the payment *577 of the purchase money secured in the manner prescribed in the covenant; such security would have answered the purposes for which he was making sale of his land. His object was to buy other lands, — this he was unable to do except by the aid of the funds to he derived from this contract. If he had the notes of two solvent punctual men, he could make engagements to be fulfiled at the same time, with assurance, that he would be enabled, by the punctuality of his debtors, to comply with his own undertakings. Hence the importance to him, that the notes should be executed at the time the possession was to be given, and hence the construction of the cove* nant here given is rendered irresistable. The conclusion, therefore, is, that these covenants are reciprocal, constituting mutual conditions to be performed at the same time, though it be uncertain which of them was to do the first act, neither can maintain an action without showing a performance, or at least a readiness, to perform on his part. Colonel v Briggs, 1 Salk, 113: Morton vs. Lamb, 7 Term R. 121: Green vs. Reynolds, 2 John Rep. 207: Porter vs. Rose, 12 John Rep. 209.
The covenants being dependant, the plaintiffs could not maintain an action at law, as they did not perform, or offer to perform, their part of the contract at the lime Stipulated for its execution. They took no steps towards the execution of the contract, until the 17th of September, 1833, and the question now is, whether this court will, under the circumstances, enforce the agreement.
According to the proof, Christmas was anxious to rescind the contract before the day arrived for its completion; and of this disposition, on his part, the relatives and friends of the complainants, and the administrators of the estate of Smith, were repeatedly informed. But notwithstanding he wished to put an end to the contract, yet he intended to perform it if required to do so. The administrator himself deposes, that Christmas never did refuse to perform his part of the contract until the notes *578 tendered in September, 1833, though he understood from his acts and conversation he was anxious to rescind it. The conditional contract he made with Camp, is a circumstance which goes strongly to show the state of his mind. He intended to comply with his contract, if required, and therefore he annexed a condition to his contract with Camp, that it should be void, if Smith did not comply with his bargain. As this state of his mind was well known to the friends and relatives of the complainants, it should have urgid them to vigilance and promptitude in the completion of the contract, on the part of Smith. There was no indication of a refusal to comply, on the part of Christmas, which would excuse negligence or delay on their part; and the fact, that he was desirous of putting an end to the contract, should have warned them, that if they failed of a compliance at the day, he would consider himself as no longer bound; and the more especially so, as they had manifested in their conversations with him a great indifference upon the subject. A failure of compliance, on their part, under these circumstances, would naturally be taken by Christmas, as an acquiescence in his wishes, that the contract should not be completed. In February, he purchased at the sale of Smith's property, in Tennessee, negroes to the amount of $1261, for which, together with a small debt he owed Smith, he executed his note to the administrators, payable the 1st of January, 1834; at which time the circumstances would have rendered it probable that something would have been said relative to the completion of the contract, if it was intended to go on with it. As, however, no indication of such a purpose was given,- but on the contrary, the taking his note indicated a different purpose, Christmas was likely to presume that it was abandoned. These indications, doubtless, exhibited the true state of mind, on the part of the .friends of the complainants. The advance in the price of lands in Mississippi, up to the 1st day of Jan- *579 vary, 1S33, and for sometime.thereafter, was very gradual. The friends of the complainants did not consider the purchase a speculation worth securing, especially as in addition to the negroes which it was necessary to sell to pay other debts, other family negroes wonld have to be sold, to secure a large unproductive tract of land at a distance from their residence, and that of their friends. While the value of the land, therefore, continued to bear some tolerable proportion to the price agreed to be given,„ a sale of the negroes, in order to pay for it, could not have been regarded as desirable. Upon this common sense view of the subject, Lemuel Smith, the uncle, and Mr. Hardeman, the administiator, no doubt must have acted. It is true, they would not agree to rescind the contract, for they had no such authority, and they did not wish to involve themselves; but they were not disposed to do any thing, by which to secure its completion. The administrator was not ignorant, that it devolved upon him to -Complete the contract, on the part of Smith; for before the 1st day of January, 1833, when the friends of Christmas called upon him, to see whether it could be rescinded, he says, in his deposition, he told them he wouid do nothing to alter the contract, and that he considered the estate solvent, and felt himself under the same obligation to pay Christmas., as to pay any other debt. He says, too, in another part of his deposition, that the note Christmas had given for negroes, purchased at the sale of Smith’s property, “would have been most willingly applied to the credit of the firsj'payment (on the contract) had Mr. Christmas desired it.” Thus, showing-that he-was apprised of the nature of the obligations which rested upon him, and that if Christmas had insisted upon their performance he would honestly have complied. But at the same time, as he forebore entirely to indicate a wish, that the contract should go on, it is demonstrated, that on the part of the friends of the complainant, there was an entire indifference upon the sub *580 ject. This admission of Hardeman, that he was bound ^ pay Christmas as he was b und to pay other debts, and that he considered the estate solvent, while it proves that lie was willing to discharge the debt in a course of administration, shows, that he did not intend to execute notes with Lemuel Smith as security. In truth, he says, in his deposition, that he declined doing anything in the contract. He was not willing to change his responsibility. This was not only showing a backwardness in carrying the contract into effect, but it indicated that he did not intend to execute the agreement according to its terms. .Christmas was not willing, when he made the contract, to take Nicholas P. Smith’s obligation, without security; much less would he have been willing to wait for his money, until he could get it from the administrator, when the estate, though solvent, was embarrassed, and in debt to the amount of twenty thousand dollars. To have given up his land, and to have depended upon such a responsibility, would have defeated the purposes for which the sale was made. No contracts for other lands could have been safely made, relying for funds to meet it on the fulfilment of this contract. Had notes been executed, with Lemuel Smith’s security, the payment of them might have been relied on, as a means of fulfilling any contract Christmas might make; or being negotiable, they might have been transferred in discharge of his own obligations, or money might have been raised upon them. It was important, then, that the notes which the contract required to be given, should have been executed; and that those, who acted for the infants, should have been ready, prompt and eager, if they wished to enlist a court of equity in their behalf. In the fall, when the property took a sudden rise, and when it was seen that the contract, if executed, would be an immense speculation, this administrator had no difficulty in knowing how to act, or in acting with the utmost promptitude. He not only tendered his own note, with Lemuel Smith *581 as security, but, doing more than the contract required, be procured Thomas II. Perkins also to be security. Now, the motive was sufficient to excite activity and vigilance, and to stimulate inquiry; and the'adminstrator states, that considering it an advantageous contract for the children, he would have put himself to natch personal inconvenience to secure its benefits to them.
Thus he proves, that on the 1st of January, he did not consider it an advantageous contract, nor was he willing to do any thing to secure it to them. It was thought, then, better to lay by and speculate on the probable advantages of the contract. The property might rise, or it might fall, or remain stationary. In either of the two latter cases, they did not intend to execute the contract. They cannot, therefore, now, after waiting eight mouths, and wilfully neglecting to do any thing, and by their backwardness authorising the inference that they did not intend to do any thing; and after the property has increased threefold, come into this court and get this contract enforced. 13 Vez. 228: 5 Vez. Rep. 818: Sug. Ven. 277, 278, 281: Jeremy, 461-2. It would be most inequitable if they could, and it is not believed that in any case, circumstanced as this is, has a court of equity ever decreed in. favor of a complainant. It is true, that the simple fact of a rise in the value of the property, is not a ground for refusing a specific performance; (2 Vern. 42-3, 280,) nor do we consider, that in a contract like this, where there is no condition that it shall be void on the non-performance of one of the parties, that time is of the essence of the contract; but time in such a case is material, and if there be no excuse for non-performance, according to the stipulations of the bargain, and the party has wilfully lain by, until the circumstances of the estate have changed, and a performance would be ruinous to the other party — a specific performance will not be de'creed. In this case, Christmas gave up an ad *582 vantageous contract with Camp, which he had made on the faith of this. Lands, in that section of the country, had greatly increased in value, before an offer was made in behalf of the complainants to perform this contract, during all which time their friends had wilfully foreborne to do any thing in the business. They come now too late to obtain the assistance of this court.
But it is said, that laches cannot be imputable to these complainants, because they are infants. Upon this part of the case, we cannot better express the views we entertain than in the language of the chancellor. “It is true,” he says, “in man} cases this answer to the objection of time elapsed, would be good for some reasonable delay on the part of the infants. In all cases, depen-ing on the question of abandonment simply, or backwardness and trifling conduct, they would be considered as standing on more favorable grounds than adults. But I cannot assent to the position, that this is to be allowed as an excuse, when the fault or delay, from whatever cause it may have-arisen, other than the acts of the defendant, has been the means of defeating the object of the defendant, or where the property has greatly risen or fallen in value in the mean time. If we adopt such a rule, while we relieve one party from an inconvenience, we do great injustice to the other. In eases of this kind, a court of equity will leave the parties to their legal remedies, and will let the loss fall where providence has placed it. This view of the question is supported and enforced Ly that able chancellor, Lord Redesdale, in the case of Griffin vs. Griffin, 1 Sch. and Lef. 352. Infants, in such cases, must always act by their friends, and their rights will he saved or lost, by the activity or negligence of those, whom nature has placed around them for their protection. If this should not be the case, the infants would be protected until maturity, which might be for twenty years or more, and, in the mean time, both *583 parties to the contract might be dead, and the situation r ° ... .of the parties interested, and the value and circumstances of the property entirely changed.”
If the infancy of the complainants be an excuse for a delay of eight months, it may, for the same reason, excuse a delay of twenty years. The injustice, such a rule would inflict upon the other party, could not be endured. But, in this case, the friends of these infants were alive to their interests. They forbore to do any thing, so long only as they believed it’would be for the benefit of the infants to forbear; but when they find, by the sudden rise of property, that it would be for their interest to act, we find them, promptly, doing all they could to secure the speculation. As the notes were at last executed and tendered by the administrators, they could have been as easily executed and tendered by them at any previous time, so that there is no pretence for an excuse for the delay, growing out of the infancy of the complainants.
Had Smith’s death, just before the time the contract was to be completed, been attended with any embarrassment, or difficulty, so that the friends of the children knew not how to act,- or were unable to act in the business; and if, so soon as they reasonably could have done so, advice had been taken, and an offer made to perform the agreement on their part — this would have been a good excuse for delay; and although the lands might have risen in lvalue, still the contract would have been enforced.
But this was not the case. The administrator, whose duty it was to act, was appointed at the October court. He wras acquainted with the nature of the contract, and knew that it devolved on him to perform it, on the part of Smith; but not believing it an advantageous one, on the part of Smith’s children, he purposely declined doing any thing, until the great rise in the value of the land, convinced him, that it would be greatly to their advan *584 tage to have the bargain executed, and then he was willing to put himself to great personal inconvenience to secure it for them. If, after all this, the infancy of these complainants should be held sufficient to excuse this delay, under the circumstances of this case, the friends of other infants will have the strongest temptation to commit the most deliberate frauds, upon persons, with whom the ancestors of such infants may contract. They may purposely hold back for years, until some favorable change in the estate shall occur, and then come forward, and offer to perform, and plead the infaney of the children as an excuse for the delay-.
Upon the whole, we are entirely satisfied with the view his honor the chancellor has taken of this cause in his opinion, and affirm his decree.
Decree affirmed.
The following is the opinion of William A. Cook, Chancellor, presiding at the trial of this cause in the court below; and as the same was sustained by this court and relied upon by the counsel for Christmas before the supreme court, it is here inserted.
William Jl- Cook, Chancellor.
The bill of complaint of Lemuel, Elizabeth P., Be-tbunia, Agnes W., Margaret and Mary N. Smith, infants, who sue by their mother and next friend, Mary O. Smith, represents, that their father, Nicholas P. Smith, on the 17th of September, 1832, entered intoan agreement with the defendant, Richard Christmas, to the following effect:
“ This indenture, made this 17th day of September, in the year of our Lord, 1832, between Richard Christmas and Nicholas P. Smith, witnesseth: That Richard Christmas and Nicholas P. Smith have made and entered into the following contract and agreement, that is to say, said Richard sells to said Nicholas, eleven hundred and *585 twenty acres of ¡and, situate in Madison county, state of n ir»i « /»»i it Mississippi, at and for the pnce oí six thousand three hundred dollars, payable in three equal annual instal-ments, without interest. An accurate description of the land cannot now bo given; but as near as may be, it is composed of three hundred and twenty acres, purchased by said Christmas of Washington Cockrell, and upon which he has settled a plantation; one hundred and sixty acres, entered by said Christmas, adjoining the same; four hundred and eighty acres, adjoining the same, purchased by said Christmas of Archibald M’Q-ehee, and one hundred and sixty acres, entered by said Christmas, timbered land, in the neighborhood, not adjoining-Now this agreement is, that said Christmas shall deliver possession of said land to said Smith, or his order, on or by the first day of next January, and shall make and execute to said Smith a deed of conveyance, with a general warranty, with a proper description of the land; end said Smith is to execute to said Christmas his three several notes, with Lemuel Smith, security, for two thousand one hundred dollars each, payable in, one, two and three years from said first day of January next, as witness our hands and seals the day and year first above written.
R. CHRISTMAS, (Seal.)
Nicholas P. Smith, (Seal.)”
That shortly after the execution of said agreement, their father, N. P. Smith, departed this life intestate, and the defendants, Thomas Hardeman and Mary O. Smith, sued out letters of administration on his estate, in the county court of Williamson, at the October sessions thereof, 1832. That their said father in his lifetime, and his representatives since his death, have at all times been ready and willing, and desirous of carrying said contract into effect; and for that purpose, the said Thomas Hardeman, administrator, and Mary 0. Smith, administratrix, executed as administrator and administra- *586 trix, jointly, their notes bearing date the-day of* September, each for the sum of two thousand one bun-dred dollars, payable to said Christmas on the first days of January, 1834, 1835 and 1836, and procured the said Xemuel Smith, and one Thomas H. Perkins, (a man of great wealth), to execute each of said notes as sureties thereto, and tendered said notes to said Christmas on the 17th day of September, 1833, in fulfilment of said agreement. At the same time, they presented to said Christmas a deed, according to the description in said agreement, (Christmas having failed to furnish a'better), and requested him to execute the same, which he refused to do. Said Christmas setting up various pretences, now wholly refuses to execute said agreement. The bill prays a specific performance of the contract and for general relief. By amendment, John Marshall is made prochein ami, and Mary 0. Smith a defendant.
The defendant admits the contract, the death of Smith and administration of Hardeman and Mary 0. Smith, as charged, but insists that the contract should not be executed, because the complainants did not, on the first of January, 1S33, or within any reasonable time thereafter, offer to comply with the contract on their part, by executing their notes with the surety agreed on; nor did they take any step in the execution thereof until after he had made very large, lasting and valuable improvements thereon. That they were entirely silent on the subject until the 17th of September, 1833, about which time the lands had suddenly increased much in value, arising from the great tide of emigration to that section of country during that year, and from other causes connected with the improvements made thereon by the delendant. That the lands at this time were worth three times as much as on the first of January, 1835. He insists that the complainants and their friends have lain by and speculated on the fluctuation of price and did not intend to *587 insist on an execution of the contract until they discovered it would be greatly to their advantage to do so. At the time the contract was made he had recently set-tied himself and his hands in the State of Mississippi, in a new country covered with forests, in whioh one half or more of the value of lands arises from their being-cleared, the erection of suitable buildings, fencing and preparing the lands for cultivation. The lands he contracted to sell to Smith were not cleared or improved, except about 100 acres, and his main or principal inducement in selling said lands .(which he in fact purchased upon speculation), was with the proceeds of the sale, to purchase another tract, which was already cleared, in order to put his hands immediately to work in cultivating cotton. Hence, it was of th'e greatest importance to him that Smith’s contract should be strictly and punctually complied with as to time.
Shortly after the contract with Smith, he made a contract with Joseph W. Camp to purchase his plantation, near to which there was valuable vacant land, which he could have entered at one dollar and twenty-five cents per acre, containing five hundred and sixty acres, one hundred and fifty of which was cleared, with all neces-cessary buildings thereon, for which the defendant contracted to give him four thousand dollars, one thousand in cash, a draft for fifteen hundred dollars, and his note for the balance at twenty-four months.
But as defendant’s means of payment depended entirely on Smith’s compliance with his contract, a condition was annexed to his purchase from Camp, that if Smith did not comply with his contract at the time therein mentioned, that then the contract with Camp was to be void. After making this contract, and before the first of January, he heard of the death of Smith, and not knowing what the situation of-his affairs was, or whether he. left sufficient estate to enable his • representatives to comply with his contract, and it being* a matter of great importance to defendant to know these facts, on account *588 as well of his contract with Camp, as the employment of his hands during that year, he, upon his arrival in Franklin, which ivas in November or December, imme- - diately applied to Thomas Hardeman, the administrator of Smith’s estate, to know what would be done in the case, whether the contract would be complied with or not. The administrator said he had nothing to do with it; nor did he offer to give the notes and and security, but stated that the estate was much involved and it would take some time to settle it up. At that time, a compliance with the contract would not have been injurious to ■defendant. The lands had not increased much in value; the public lands were not all sold, so that if he missed the contract with Camp, other lands could have been purchased upon equally advantageous terms. And as he had settled in Mississippi, and all his hands were there, twenty or twenty-Ove in number, he was obliged to have a plantation or his hands would be idle during the year. If he completed the contract with Camp, or purchased another farm, it was uncertain whether Smith’s administrators 01; heirs would comply with their contract; if it was not complied with, his means of payment for the other would have bean exceedingly limited, and he would have had two plantations, and hands only sufficient to work one. He was willing to comply with the contract on his part, and he was desirous of having a farm for the employment of his hands, and that too before all the public lands were sold.
Thus circumstanced, and finding that by the accident of Smith’s death, a compliance with the contract was either not intended, or had become impracticable for a considerable length of time; and not receiving the notes at the time contemplated, he was forced to abandon the contract with Camp, of which he informed Camp by letter from Franklin, and a very short time thereafter, Camp sold the land for five hundred dollars more than the price be was to give him for it.
The administrator having thus declined having any *589 thing to do in the matter, r.o person as guardian or next „ friend of the children stepping forward to execute the contract in their behalf, and it being uncertain whether Smith’s estate would be able to comply; forced by these circumstances to give up his contraot with Camp, he had either to go on and employ his hands in clearing the land and improving it, and thereby considering the contract for want of fulfilment on the part of Smith’s representatives, as at an end, or he must lie by idle and await such time as suited them, which probably would depend altogether upon the fact, whether the lands in the mean time had risen in value, added to all which, he had no security for the purchase money. Considering therefore, that the contract was at an end, he, some time after the first of January, commenced clearing and improving and raising a crop. He built a gin and press worth fifteen hundred dollars, a dwelling house worth six hundred dollars, an office worth two hundred dollars, nine or ten negro cabins worth four bundled dollars, a cistern and house around it worth three hundred dollars, besides stables, horse lots, &c.’ He also cleared two hundred and fifty acres, and enclosed all the cleared and part of the wood land, and put it under good fence, in, all about seven hundred acres. This was all done before the tender, as charged on the 17th September, 1833.
He likewise purchased eighty acres of wood land adjoining, which was of essential importance to the land. All these improvements, and the purchase of the eighty acres adjoining, have greatly enhanced the value of the lands originally contracted to be sold, and have made them worth three times the amount originally to be paid for them by Smith.
The defendant charges that there seemed to be no disposition or intention on the part of Smith’s represetta-tives to comply, until the advance in the price of land took place, which was during the summer and fall of 1833. In consequence of the sudden rise of the lands *590 produced by (be settlement of, and emigration to, the country, and other causes, and the great and increased-value of this tract in particular, by the lasting and per- - maneut improvements put on it, the eyes of Smith’s representatives become suddenly opened, the estate became suddenly ample and sufficient, and in September, 1833, eight months or more after the contract was to be executed, and after the lands had greatly risen in value, and before defendant’s crop was gathered, they came forward and tendered the notes and deed as stated in the bill. Under these circumstances, the defendant refused to comply, his object in selling having been defeated by the delay. lie admits the solvency, &c. of Thomas H. Perkins, and prays to be dismissed.
Complainant’s proof in substance is, that N. P. Smith departed this life on the tenth of October, 1S32, and Thomas Hardeman and Mary. 0. Smith sued out letters of administration on the 13th; and that among intestate’s valuable papers was found the contract in relation to the land; about the same time they received two letters from defendant directed to the intestate; one dated the 4th October, and the other a few days thereafter, desiring a ¡escisión of the contract, alleging that his brother Harry, who seems to have been connected with him in business was very much dissatisfied and very averse to giving up the place. During the month of October, and the first of November, several gentlemen, to wit: Wr. Wood, Mr. D. P. Perkins and Mr. Hilliard Christmas, at the instance of defendant, called on Thos. Hardeman, the administrator, and made the same request with that contained in the two letters. In November, the defendant himself applied to said Hardeman and made the same request, urging the same with the same reasons as before stated. The administrator deposes that he replied to the defendat, “that he had found the contract among Smith’s papers; that he felt himself under the same obligation to discharge the debt to Christmas as any other *591 debt aerainst the estate; that he considered the estate en- ° . tirely solvent, and would prefer to do nothing further with the contract by which it would be altered, because such interference would change his responsibility. He desired Christmas to take legal advice on the subject, and if it should be considered that he bad authority to rescind the contract, and he could be satisfied it was for the interest of Smith’s estate, he should do so.
The defendant, Christmas, was indebted to Nicholas P. Smith about twenty-five dollars, and at the administrator’s sale, in February, 1833, he purchased negroes to the amount of twelve hundred and sixty-one dollars, and gave his note for the two sums, payable on the first of January, 1834, which was paid by the defendant shortly after its maturity. Smith’s estate was largely indebted, between twenty and thirty thousand dollars, and a large sum was owing to it. In the opinion of the administrator he will be able to pay .off the debts, and leave from fifty to seventj-five slaves for distribution.
The defendant proves by William B. Norfleet, who was present when the contract was made, and when it was reduced to writing, that he informed Smith his object in selling was to buy Joseph W. Camp’s place with the proceeds, and that he enjoined the strictest punctuality on his part, and told him if he thought he would not be punctual he would not sell him the land. Smith offered Thomas H. Perkins as security, and defendant refused to take him, stating as his reason for so doing, that, although very solvent, he was notorious for his want of punctuality and indifference for being sued. Said witness further deposes, that it was agreed by Smith with defendant, that he would give him three bills on some house in New Orleans in lieu of the notes, and thereby enable him to realize the money one year soonet on each payment. Mark R. Cockrell deposes, that he was acquainted with the plantation whereon the defendant resided in September,' 1833. There were considerable *592 settlements in the country at that time, but they have . . , , . , since greatly increased; that improved lands were then worth about twelve or fifteen dollars per acre, and unimproved lands from three to eight dollars, according to their quality.* That the tract of land in controversy, with its improvements, would, in October, 1833, sell for about twenty dollars per acre, on a credit of one, two, and three years. There was a gradual improvement in the price of lands in that section of country from the beginning of the year 1832, to the fall of 1833. At that lime there was a much greater improvement than there had been at any time previous. The chief value of lands in that section in the snmmer and fall of 1332, consisted in their state of improvement. A large portion of the goveanment lands have been sold since 1832. It is worth about fifteen dollars per acre to prepare and put in cultivation such land as that in controversy.
Joseph W. Camp deposes, that in the fall of 1S32, the defendant made a conditional purchase of him of five hundred and sixty acres of land, for which he was to pay four thousand dollars, oue thousand in cash on the first day of January, 1833, when possession was to be delivered, and the balance in one and two years.
There was a condition annexed to this contract that, if N. P. Smith complied with his contract with the defendant, then he was bound to take deponent’s land, but if he failed to comply then the contract was to be void. In consequence of the death of Smith, and the failure on Smith’s part to comply with his contract with Christmas, the contract between deponent and him was put an end to, and he shortly after sold the land for four thousand five hundred dollars, and it is now worth twenty dollars per acre. Deponent being interrogated, states, he does not believe Christmas at that time had funds sufficient to complete his purchase without the aid of the means to arise from his contract with Smith. There was then in -the neighborhood a considerable quantity *593 oí vacant land which has since been entered, and is worth from ten to fifteen dollars per acre. There were also large bodies of vacant land in othek parts of the country,, which have since been entered, an4 are now rated at from ten to fifteen dollars per acre. , J^mes W. Smith deposes, that such land as Christmas’, in the fall of 1832, were worth about six dollars per acre; they gradually improved in price till the fall of 1833, when they suddenly rose to fifteen dollars per acre; which is about their present value. In the fall of 1832, Christmas had cleared about one hundred and twenty-five acres, and had no other valuable improvements; since that time there haveiteen about two hundred and twenty-five acres cleared up-to September, 1833; also, there has been erected a gin _and press, one large crib, nine negro cabins, one dwelling-house, one office, one cistern and shelter, worth about two thousand dollars, exclusive of the clearing of the land, which is worth twelve dollars per acre.
George Lavender deposes, that Christmas cleared, from September, 1832, to September, 1833, about two hundred and fifty acres of land, and made the other improvements spoken of in Smith’s deposition. And James Ewing deposes, that in the fall of 1832, he entered upwards of five hundred acres adjoining defendant’s tract, which'is now worth eight dollars per acre.'
This cause has been argued with singular ability; and after the most attentive consideration, I cannot find any principle upon which a specific performance of this contract can be decreed.
The contract was entered into on the 17th September, 1832, and was to have been consummated by a deed of conveyance and delivery of possession, on the first of January, 1833, at which time the notes with security were to be executed. I do not think it material to inquire very minutely into the legal construction of these covenants, whether they are dependent or mutual; or if dependent, who was to have done the first act; because) if *594 it should be conceded that the covenants were depend- * ent, and Christmas was to have performed the first act; yet that act being of a local character, and to be performed on the land, no person on behalf of the complainants were upon the land to receive a deed and possession on the first of January, and to execute the notes for the consideration to Christmas, who was upon the land at that time.
But if it were necessary it would be easy to show, both from reason and authority, that these covenants are reciprocal, constituting mutual conditions to be performed at the same time.
“ Where two acts are to be performed at the same time, as where A covenants or agrees to convey an estate or gopds to B on a named day, or generally, neither can maintain an action without showing a performance or an offer to perform, or at least a readiness to perform on his part, though it is not certain which of them was to do the first act.” Callonel vs. Briggs, 1 Salk. 113; Morton vs. Lamb, 7 Term Rep. 130; Green vs. Reynolds, 2 John. Rep. 207; Porter vs. Rose, 12 John. Rep. 209. And this rule particularly applies to contracts of sále, 1 Saund. Rep. 320, note 4 and referendes; Lancashire vs. Killingworth, Comyn's Rep. 117; Norwood vs. Read and Hearne, Plowd. 180; Ransom vs. Johnson, 1 East’s Rep. 293; 2 Saund. Rep. 352, note 3; 8 Term Rep. 366; 1 Chit. Plead. 314.
These covenants being dependent, the complainants could not maintain an action at law, as they neither performed, or were ready and willing to perform their part of the contract on the 1st of January, 1833, and were not prevented from doing so by the acts of Christmas..
They took no steps towards the completion of this contract until the 17th of September, 1833, between eight and nine months after the time when, by the written contract, it was to have been consummated They not only took no steps in the matter, but they remained *595 wholly silent on the subject. They did not distinctly apprise Christmas that they/intended to insist on a fulfillment of the agreement. . ' '
Some short time after the death of Smith, in the month of November or December, the defendant applied to Thomas (Hardeman, the administrator, to know what was intended on the part of Smith’s heirs, whether they designed to comply with the contract or abandon it. He expressed a desire of putting an end to the contract. How was he answered? He was told by the administrator that he did not consider himself authorised to do any .thing in the matter, but was advised by him to take legal advice, and if he should be found authorised, and it could be made appear that it was for the advantage of Smith’s heirs, he would/rescind the contract.
The matter remained in this situatoin until the 1st of January, thetime when, by terms of the-contract, the deed was to be made and the notes given for .the- consideration. Christmas was upon the land, and no person came forward on behalf of the heirs to carry the' cbntract into effect. They remained perfectly silent in every sense of the word, until the 17th of September, 1833. Upon the failure of the complainants^ on their part to take any step toward the completion of the contract, the defendant determined to put an end to it. He commenced clearing and improving the land; and by the 17th of September, 1833, the improvements máde thereon were of the value of about seven thousand dollars, more than the whole consideration agreed to be given by Smith.
It is also in proof, that the defendant, before and at the time of entering into the contract, informed Smith that his object in selling was to purchase a farm in the neighborhood, of Joseph Gamp, of about five or six hundred acres, that was in a much higher state of improvement, ,and thatihe enjoined upon him the strictest punctuality in the execution of the contract, and told him if he believed he would not be punctual, he would not make the sale to *596 him. Shortly after entering into this contract with Smith, the defendant purchased Camp’s land at four thousand dollars; one thousand in hand, and the balance at twelve and twenty-four months. To this contract there was a condition annexed, that if Smith failed to comply with his contract with the defendant, this contract with Camp was to be void. Upon default made by Smith’s representatives, the defendant immediately communicated the fact to Camp, and surrendered up that contract.
Under this state of facts, I do not deem it material to examine the much disputed question, whether in a court of equity time is of the essence of the contract, because from the view I take of this case, the dismission of this bill can be placed upon grounds, to me, perfectly satisfactory, aside from this question.. But as the point has been raised by the counsel, I shall not pass it by without observing, that although in the early history of jhis court, cases can be found, which, if they stood alone, might justify such a doctrine; yet, even at that peried, the contrary doctrine has been maintained by very high authority. In Hayes vs. Corryl, as early as 1702, 5 Vin. Ab. 538, pl. 18, it was held, that where one person has trifled or shown a backwardness in performing his part of the agreement, equity will not decree a specific performance ip his favor, especially if circumstances are altered.
From a note of the case of Gregion vs. Riddle, read by Sir Samuel Romily in the case of Sexton vs. Slade, Lord Thurlow is reported to have said that time was not of the essence of the contract nor could it be made so by express contract. This doctrine of Lord Thurlow has long since been overruled. Lord Eldon, in Seaton vs, Slade, expressed, his decided disapprobation of such a doctrine, and considers the result of the cases as establishing the position, that a mere failure to comply on the part of complainants at the stipulated time, will not of itself oust this court of its jurisdiction to decree a specific performance; that to produce this effect, the de *597 fault must be connected with other circumstances of hardship, inequality, &c. In Lloyd vs. Collet, 4 Bro. C. C. 469; 4 Ves. 689, Lord Loughborough uses very strong and emphatic language on this subject. There is nothing, he observes, of more importance than that the ordinary contracts between man and man, which are so necessary in their intercourse with each other, should be certain and fixed, and that it should be certainly known when a man is bound and when not. There is -a, difficulty to comprehend how the essentials of a contract should be different in equity and at law.
It is one thing to say that time is so essential that in no case in which the day has by any means been suffered to elapse, the court could relieve against it and decree a performance.
The conduct of the parties, inevitable accidents, &c. might induce the court to relieve. But it is'a different thing to say the appointment of a day is to have no effect at all. In most of the cases' there have been steps taken. “I want a case,” he says, “to prove' that jyhere nothing has been done by thd'parties, this court will hold, in a contract of buying and selling, a rule that the time is not an essential part of the contract. Here no step has been taken from the day of sale for six months after the expiration of the time at which the contract was to be completed. If a given default will not do, what time will do? It would be well, before we proceed, to compare this case for a moment with the one now before the court. In the case of Lloyd vs. Collet, the contract was to be completed on the 25th March, 1793, and one hundred pounds was paid by the defendant at the time of making the contract. Shortly after the 25 th of March, the complainant having taken no steps towards a completion of the contract, the defendant wrote to complainant’s solicitor for a return of his deposit, with interest from the date of the payment. No abstract was delivered till the 16th of September, 1793, upon receipt of *598 which, the defendant wrote to complainant’s solicitor refusing to complete his purchase. The value of the property had, between the 25th of March and that time, depreciated five hundred and sixty pounds or upwards. There had been a default of six months between the time when the contract should have been completed, and the time when any step was taken by the complainant.
In the case before the court the default was between eight and nine months without any step being taken. In Lloyd vs. Collet, the property had deereased in value upwards of five hundred and sixty pounds; in the present case the property, exclusive of the improvements, had increased in value about ten thousand dollars.
Laying aside the other strong features of the case before the court, it cannot but be admitted that it is a much stronger one for the defendant than that before Lord Loughborough. Here the time is longer and the alteration in value greater. The observations of the Master of the Rolls in Milward vs. Thanet, 5 Ves. 720, is very decisive upon this question. He observed, that “Lord Kenyon was the first who had set himself against the idea that had prevailed, that when a contract was once entered into either party might come at anytime.” That it was then perfectly known that a party cannot call upon a court of equity for a specific performance unless he has shown himself ready, prompt and eager. Many other cases might be cited to the same effect.
Upon a careful examination of all the English authorities, I think the following will be found to be the settled doctrine of this court.
When a court of equity holds, that time is not of the essence of the contract, it proceeds upon the principle that having regard to the nature of the subject, time is immaterial to the value, and is urged only by way of pretence and evasion. 1 Sim. and Stewart’s Rep. 590, Dolorch vs. Rothschild.
That where the contract upon its face is to be void in *599 case of default, there the defendant may so consider it; though, if he waive the default, the circumstances remaining the same, he will be bound by the contract. Where there is any change in the circumstances, either of the estate'or the parties, as the falling in of lives or any great rise or fall in value, a specific, performance will no be decreed. That where the delay has operated injuriously to the defendant, or where his object in making the contract has thereby been defeated, a performance will be refused. Crofton vs. Ormsby, 2 Scho. and Lef. 604. Where the party has lain by and speculated, or lias trifled and shown a backwardness in carrying the contract into effect, no decree will be made in his favor. 12 Vez. Rep. 228: 5 Vez. 818, Guest vs. Humphsey: see also Sugden on Vendors, 277, 278, 281: Jeremy 461-2.
If this be the state of the English law, what ought to. be the rule in this country? In England land is of a permanent and fixed value. There is but very little fluctuation in price; so that what is a'fair valuation in one time is generally the same a year or two afterwards. This rule, then, that time is not of the essence of the contract, restricted as it is by the modern doctrines of this court, may have pretty extensive application in practice in that country, consistently with the substantial rights of the parties.^ But as often as the application of the rule would not subserve the ends of justice, the courts have departed from this rule and refused to enforce the contract. In this country, which is comparatively but newly settled, where the price of land depends upon the tide of emigration, the settling and improving of particular sections, the springing up of towns aijd other causes operating to change the price in particular neighborhoods as well as larger sections, the rule restricted as it should be, would be found of much less practical utility. In this country, time should be regarded as a circu,instance of decisive importance, fixing the *600 necessity upon the negligent party, of observing that the defendant has waived the default, or that no inconvenience or loss will arise to him, and that the property is substantially of the same value. This is the view taken of the subject by chancellor Kent, in Benedict vs. Lynch, 1 John. C. Rep. 379, with whose general course of reasoning in that case I entirely concur.
Let us then apply the above principles to this case and see upon what foundation it stands.
The complainants, as has been shown in the former part of this opinion, were clearly guilty of neglect and default on their part, from the first of January till the 17th of September following. What sufficient excuse can be offered for this great backwardness? It is said they were infants. That the death of Smith was the act of God, and being in minority they will be excused. It is true, in man} cases this answer to the objection of time elapsed, would be good for some reason-áble delay on the part of the infants. In all cases, depen-ing on the question of abandonment simply, or backwardness and trifb’ug conduct, they would be considered as standing on more favorable grounds than adults. But I cannot assent to the position, that this is to be allowed as an excuse, when’the fault or delay, from whatever cause it may have arisen, other than the acts of the defendant, has been the means of defeating the object of the defendant, or where the property has greatly risen or fallen in value in the mean time. If we adopt such a rule, while we relieve one party from an inconvenience, we do great injustice to the other. In eases of this kind, a court of equity will leave the parties to their legal remedies, and will let the loss fall where providence has placed it. This view of the question is supported and enforced by that able chancellor, Lord Redesdale, in the case of Griffin vs. Griffin, 1 Sch. and Lef. 352.
A guardian might have been appointed for the infants, if one was deemed necessary, at the October sessions *601 of the Williafnson county court, at the same time that letters of administration were sued out; or if that should be considered extraordinary diligence, and too much to be required of infants, the friends of the, infafits should have acted at least by the January session following. Infants, in such cases, must always act by their friends, and their rights will be saved or lost, by the activity or negligence of those, whom nature has placed around them for their protection. If this should not be the-case, the infants would be protected until maturity, which might be for twenty years or more, and, in the mean time, both parties to the contract might be dead, and the situation of the parties interested, and the value and circumstances of the property entirely changed. But it seems in this case, that no guardian has as yet been appointed, so that the active steps that were taken on the 17th of September, 1833, were so taken by no other persons than Thomas Hardeman and Mary 0. Smith, the friends of the infants. These acts were the acts of adults for the benefit of the infants, and no reason can be assigned why they did not act sooner.
In the language of Lord Redesdale, in the case of Griffin vs. Griffin, “When the defendant offered to fulfil the contract,” provided it was complied with at the time, “the friends of the infants ought immediately to have • acceded.” They knew they had to deal with an unwilling vendor, and that the lands were of undefined value. What ought the friends of the infants to have done under these circumstances? They should have had a guardian appointed if they thought it material, and have come forward on the 1st of January, and given the bond and security required by the contract. But instead of this how did they act? Thomas Hardeman, the active administrator, says he is not the proper person to act-in the matter. Was he not the proper person? Most unequivocally he was. The administrator had possession and control of the whole personal estate, The heirs had *602 a clear equity to call upon the administrators, and coni-pel them to complete the contract by giving the bond and security, and paying the same out of the personal estate.
The defendant had a right to look to them, and legally could look to no person else. If by failure of the administrators to comply with the contract, the land should be lost to the heirs, they would have an equity to come into this court, and have the value of the land raised out of the personal estate and paid to them, or invested in other real estate.
Instead of acting, as he should have done, the administrator told the defendant, he considered himself as much bound to pay this as any other debt against the estate, thereby clearly leaving the defendant to the tardy process of the law to enforce his claim, and that, too, not against the principal and surety, but against the estate of the principal alone. In the month of February, the personal estate is offered for sale, and at that sale the defendant purchased property to the amount of twelve hundred and sixty dollars.
For this purchase, as well as the small open account on the books of Smith against Christmas, his note with security is required, payable on the 1st of January, 1834, according to the terms of sale. Why did not the administrator and administratrix offer these debts as part payment, or set off to the first payment falling due at the same time, and give the bond and security required by the contract? By taking the bond of the defendant, they even placed it beyond his power to plead this debt as a set off, and thereby had it in their power to enforce payment from him. Shipman vs. Thompson, Willis, 106.
No reasonable excuse can be given for this course of conduct. The natural conclusion is, they were speculating upon the probable advantages and disadvantages of the contract. The property was not of any perma *603 nent or fixed value. It might rise, it might fall, or it might remain stationary for some time. In either of the two latter, cases they did not intend to execute the contract. A purchase of that kind did not suit their helpless, infantile situation. The land v/as far removed from their residence, in a new country, and among strangers; they were themselves unfit, and had no persons qualified to engage in such an adventure for them; they had no money to lay out in lands, unless they'made a very great speculation; the estate was largely indebted, and many family negroes would have to be sold. No person in that situation would sell their slaves and buy land in a distanW:ountry at a fair value; no friend would advise the infants to do so. Slaves are productive property 5 and uncultivated land is not. The proof shows that the lands had not risen in value on the 1st of January to any extent.
They imagined they had the advantage of Christmas. His situation was very different from that of complainants. He had recently settled in the country with a view of raising cotton. He had his hands and his all upon the ground. They must be employed, or his loss would be great and his whole object defeated. It was necessary, therefore, that he should have a farm with the necessary improvements to carry on his operations with success. He sold this land, intending with the proceeds to purchase one better improved; upon the failure of complainants to comply with their contract, he was compelled to give up his purchase from Camp, and to put an end to the contract with Smith. He accordingly immediately commenced the necessary improvements, and was preparing for a crop.
They knew, therefore, he was willing and desirous of being off the contract. They then, as they supposed, had nothing to fear, for he would at any time agree to rescind. They could, therefore, safely lie by and speculate. I am fully persuaded that no impartial mind can *604 come to any other conclusion from the facts and circumstances of this case. In the fall, as appears from the proof, there was a sudden and considerable increase in the value of the land, not1 unfrequent in newly settled counties. At this time, and not before, they come forward with great preparation, and tender the notes with not only Lemuel Smith, but Thomas H. Perkins, as sureties, and demand a deed. Why was this particular time selected? Why not a month or two sooner? No reason can be assigned but the great prospect of gain just then offered by the rise in the price of the property about that time. Why did they offer Thomas H. Perkins as surety? His guaranty was not contracted for. It shows that their eyes were suddenly opened; and in their anxiety to secure the prize, they offer to' do more than they were bound to do, had they done that at a proper time.
But they should have recollected circumstances had very much changed with the defendant. He had put large and valuable improvements on the land, and had permanently, as he supposed, settled himself upon it. These improvements had cost him much labor and expense.
All this time they were looking on, knowing that the defendant was attempting to put an end to the contract, and was acting under the belief that he had a right to do so. They did not attempt to undeceive him, if he was deceived. They did not tell him they intended to hold him to the contract. And, least of all, do they make any offer or effort to execute the contract according to its terms. Christmas has given up an advantageous contract with Cramp, made on the faith of this. The time to procure other lands, in that section of the country, on advantageous terms, had to some extent passed away, and he had made other investments and purchases. All this conspired to place the defendant in a situation in which a specific performance would be ruinous to him. *605 Had he not a right to expect more punctuality in the - , . ,r-r, , 1 r , execution of this contract? from the prool he certainly had.
But it is urged, that the defendant could not put an end to the contract himself. He should have filed a bill for that purpose, and had the contract rescinded by this court. To this it may be answered, that if the court then would have rescinded the contract, it surely will not now execute it. The defendant certainly had a right, by the authorities, to have sold this land to another person. If so, why not put an end to it and keep it himself? The remedy by filing a bill is tardy, and by no means adequate. That it was not necessary, may be seen from the case of Griffin vs. Griffin, and from the case of Brazier vs. Gratz. 5 Pet. Con. Rep. 165.
From this view of the case, both upon the law and the facts, it follows that this bill should be dismissed.